I call our last argument of the day, which is Delgado-Sobalvarro v. Attorney General May it please the Court, my name is Joseph Hohenstein and I represent the Petitioners Angelica Raddau and her daughter Lily in this case. I respectfully request the Court to your 10 minute time. I understand. There are three reasons that the Court can reverse the Board of Immigration Appeals in this case. The first is the plain language of the statute and the meaning of the word parole. The second is this Court's precedent decision from Zeng v. Gonzalez. And the third is that the government's position in this case does not have the inherent power to persuade if in fact the Court were to find that the language isn't plain and the Court's precedent doesn't hold. Let me ask you about the first one. Yes. Parole. Isn't there a term of art here, parole into the United States that is involved and the parole that you're seeking to have eligible for adjustment of status is not parole into the United States. Well in terms of the plain language in two different parts of the section of the Immigration Nationality Act and then the third section that I'm asking you, yes the words parole into the United States appear in section 245A which is the adjustment section and section 212D which is the parole section that the government says is the only one that applies. When did that language get into 245A? In 1960. So that was not in connection with the Cuban Relief Act? No. Although the Cuban Adjustment Act occurred in 1966 and used identical language. And that is one of the issues that we have with the Ninth Circuit decision on this issue which is the Ninth Circuit simply said it's similar language. It's not. It's identical language. And in that regard the focus of the Ninth Circuit on the word conditional in front of parole in the third section that we say applies which is 236A, that parole is the same as the parole in the other two. And the reason for that is the Ninth Circuit's focus on the notion of conditionality or discretion in granting a 236 parole exists in the 212D context as well. Ms. Delgado was not paroled into the United States was she? She was paroled. Just conditionally paroled but not paroled into the United States? Under 212D she was not paroled into the United States. However, the 236A parole that she was given is parole in the sense that it ought to be considered into the United States. And in that regard the reason I say that the words into the United States really are additions because in that regard if you look at 236 she was permitted entry into the United States. She was here but then the idea of the conditional parole was really her release as such as compared to parole in the United States for humanitarian reasons is it's okay for you to be here. Correct? Correct. And wasn't Zhang given parole in advance into the United States? I mean you all dispute what happened there. I know you were counsel for Zhang but it looks to be like he was given parole into the United States ahead of his arrival. There certainly was that consideration. And my point is what you have to look at is what were the considerations in granting the parole not what was the final suit or covering that was put over the parole. And in Zhang you're right. Zhang had the previous permission. But that was under a non-statutory version of parole. And the key elements of the notion of humanitarian or public interest concepts that structured the decisions around those paroles. That is the identical situation here. How do we know that? We have conditional release here. Do we know anything really as to the surrounding circumstances? Well, we know that she was a young woman traveling by herself with her baby. And the idea of traveling with a small child and the idea for the government of having to detain someone in that situation could easily say we both on humanitarian grounds want to parole you in or allow you to come in so that we don't have to hurt or harm you and your baby. And for us as a government it's in our public interest not to be regularly detaining families or people with small children. It could have said that but it didn't say that, did it? It didn't say that but that's not the way that the document is structured. And it's also not the way that the majority of 212D documents are structured either. Based on what you say, there's a practical consideration, Mr. Hauenstein, that maybe you can help me consider. And that is at any time somebody comes into the United States illegally, let's say as in this case through Texas, with or without a child. Now, the government has to make a decision whether to hold that person in detention or release that person. The term, I guess, would be parole, release until your next hearing. Correct. Now, under your theory, anybody that is released on parole illegally, that comes into the United States illegally, would be eligible under 2555 for an adjustment of status if that person marries a U.S. citizen. Correct. If that person subsequently becomes eligible for a visa by marrying a U.S. citizen. But the point is that, I mean, is that the policy that you want to result from your argument? I think there is a key element in this, and that is what I was just talking about, which is examining the factual circumstance. And maybe that might need to be what's done in this situation. It's not necessarily to say that all 236 paroles can be paroles into the United States for 245A, but that there needs to be a factual investigation into the reasons why. Oh, a pretty heavy burden on the immigration judge. I mean, it either says or doesn't say. I mean, the language either is susceptible to a certain meaning or not, plus the fact you have 1255I, which limits adjustment of status for certain unlawful entrants. So don't you have a real conflict between 1255I and your argument that this provision under 236A equals parole into the United States? Therefore, everybody can adjust. But let's go back to the Cuban Adjustment Act. That's exactly the manner in which any number of Cubans come into the United States, Your Honor. They come in, and they are examined or caught out on the high seas and then brought in. And the idea that the 245I provision would apply to them is waived also because they're seen as being paroled. And like I said, in this instance, if you look at the way the – and this goes to the last argument, which is the power to persuade. The government has already said in its two memoranda, first, 236 and 212 are identical or complementary mechanisms, not separate mechanisms. Let me ask you another question. Yes. You said 245 was first enacted in 1960. The language here. Parole. Correct. What statutory provision was there at that time which allowed parole into the country? That I'm – I believe 212 existed. I don't know if the equivalent mechanism to 236 existed. I could investigate that with the court. But the statutory section at that time that dealt with detention would be 241, I believe. We would investigate whether a similar language was used. But the seminal case that the agency looked at when it wrote those memos was Lengmei Ma. And that was someone coming in who was at the border getting inspected. And the focus there was what are we doing about this person's custody. And that is exactly the same focus that was done when the legacy – or actually, yes, the legacy INS investigated Mrs. Radoff's situation and said what are we going to do about this woman's custody. And in that context, there's no difference or distinction between what it did in 236 or what it would have done in 212. Do you know any instance, Mr. Hohenstein, where an alien was conditionally paroled under 1226? 1226. 1226 and was able to get a 1255 adjustment? This would be a case of first impression in that regard, Your Honor. I have not seen it. I investigated it, asked our national association about it, and this would be a case of first impression on that. I see that my time is up. I'll reserve for review. Great. Thank you. May it please the Court, Sol Greenstein, on behalf of the Attorney General, this Court should join the Ninth Circuit's decision in Ortega-Cervantes and deny the petition for review. One is paroled into the United States under 212D5A, which allows DHS to parole an alien into the United States for urgent humanitarian reasons for significant public benefit. Does that happen with some opinion behind it or some statement or some flurry of this is why or this is the reason? Is that customarily a decision that's recorded with a basis that's stated? Well, usually an I-94 is issued and there typically is a memorandum in the file of some sort articulating why DHS paroled the alien into the United States. Mr. Greenstein, I had to pause reading the record in this case because the I-130 application for permanent residence was submitted in 1993. It's over six years, which seems like an extraordinarily long time. Can you explain why the length in acting on the I-130 and tell us what the current status is? The I-130 was approved about a year ago. And irrespective of the length of time that it took, it doesn't change the fact that appellants are not eligible for adjustment of status. Well, wait a minute. The I-130 was approved making her eligible to apply for adjustment of status. You say she's not eligible, however. She's not eligible given the manner of her admission, yes. She could apply overseas and get consular process with the waiver of her unlawful presence. And I mean both appellants. And she could be then admitted into the United States if the DHS chose to do that. But the I-130 was decided on the basis of what? The marital status? On the basis of her marriage. But this supersedes that. What would supersede that? The fact that she's not eligible to adjust that. That's correct. That's correct. Yes, Your Honor. Has an I-94 ever been issued in the case of a Section 236 parole? To my knowledge, absolutely not. What happens when an alien is given a 236A parole is that they're given an order of release on recognizance, simply memorializing their release from DHS custody without payment of a bond. And 236A is concerned with nothing other than the physical custody of an alien and has nothing to do with parole of an alien into the United States. It's a mechanism where aliens who are placed in removal proceedings are released on bond. There are types of aliens ineligible for release under 236C's mandatory custody provisions. Those are predominantly criminal aliens that are removable as aggravated felons, as controlled substance violators, and the like. Aliens not subject to 236C's mandatory detention provisions are subject to 236A, which allows DHS to continue to detain the arrested alien, release the alien on at least a $1,500 bond, or release the alien on conditional parole, i.e. without the posting of a bond. All that conditional parole means is a release on recognizance. Well, I just used the word paroled to obviously confuse us all. That's it. How about the two memos that the appellant points to that seem to equate parole and parole? How do they not bear here and help the appellant's case? Firstly, as noted by the Ninth Circuit in Ortega-Cervantes, internal guidance memos are not binding authority and are entitled to respect only to the extent that they have the power to persuade. They're not statutes or regulations. They're internal. Why are they not persuasive? Well, I would sort of state that, most importantly, the language in the 1998 INS memo on which appellants rely was superseded by a September 27, 2007, internal DHS memo entitled Clarification of the Relation between Release under Section 236 and Parole under Section 212b-5 of the Immigration Nationality Act. This memo explicitly rescinds the language in the 1998 memo referring to conditional parole under 236a and parole under 212 as complementary provisions. The appellants rely on paragraph 7 in the 1998 memo, and the 2007 memo is clear about it being superseded. The 2007 memo further concludes that conditional parole under 236a does not equate to parole in the United States under 212 and typifies conditional parole as nothing more than the mere release from physical custody. With her I-130, Ms. Delgado could go overseas, apply for a visa. Would she get one immediately? She would have to be granted a 212a-9 waiver because she's been illegally present in the United States for a period of over one year. But that could be granted. But one of the reasons for that is because of the delay in processing all this. Well, it's only a year. It only requires one year of legal presence, Your Honor. And also, the granting of the I-130 would not accord her any legal status while she's in the United States. It's only after she's left the United States and applied for overseas processing that the granting of an I-130 would factor in. So she's free to apply for a 212a-9 waiver. I mean, why I'm asking this is it seems to me that the expense involved in this and the separation of the family is a pretty hard burden to put on a family where I think it's been recognized there's a legitimate marriage. They're children born subsequently. And why make people go through these contortions when you have recognized that there is a legitimate marriage? Because, Your Honor, appellants, when they arrived at the United States, they could have presented themselves to a port of entry, to the former INS, and asked for parole into the United States. Didn't they do that? No. They entered surreptitiously and were caught either at the border or after that. But they did not present themselves. They made the decision to evade apprehension and inspection by DHS or the former INS. So it was their decision to not risk applying for parole into the United States and to try to surreptitiously enter. Is there an alternative to going back to Nicaragua and applying through the consul in Nicaragua? There isn't, Your Honor, because 245I has already sunsetted. Had appellants submitted their application for an immigrant visa before April 30, 2001, then they'd be eligible to apply under 245I. But that provision expired, so they can't adjust, and they do indeed have to go back to Nicaragua. Counselor, did you refer to that September 2707 internal memo in your brief? No, I didn't, Your Honor. Because, obviously, Ortega doesn't, because it was filed September 4, 2007. Can you please provide us by letter exactly what that internal memo is? I mean, does it have the same force as the 1998 memo? It does, Your Honor. I've asked DHS. DHS would like to keep the memo internal. Well, then we want to see it. Okay. Or else we take no, you know, if it's confidential and internal and not, you know, you're not relying upon it, but you've relied upon it here. That's correct, Your Honor, and I did also learn about it recently. And I would also note that I believe it's available somehow on the AILA website. I ran a Google search for the title of the memo. Well, we're going to leave that to you to figure out. Yeah. I sort of found that remarkable. All right. If you would provide that and provide it to opposing counsel, who probably has not seen it either. Okay. There are several other reasons why conditional parole should not be equated with parole into the United States. Interpreting conditional parole as parole into the United States for adjustment purposes would be of little practical effect. Instead of granting conditional parole, all DHS would have to do to eliminate an apprehended eligibility, an apprehended alien's eligibility for adjustment of status, is set the minimum bond of $1,500 because then you go from no bond, i.e., It's not typified as conditional parole anymore, so it's basically semantic. Secondly, only DHS has parole authority under 8 CFR 212.5. Immigration judges, contrastingly, may redetermine bonds under 236 and grant an alien conditional parole setting no bond. Interpreting conditional parole as parole into the United States would therefore violate 212.5 because it would abrogate DHS's exclusive authority to parole an alien into the United States. So who is it who decides the parole that is conditional release? That's an individual immigration judge? No, first it's DHS, and then an immigration judge reconsiders it upon an alien's bond hearing. So an immigration judge could change the bond and grant conditional parole under that? That's correct. And conversely, if DHS had set a bond, an immigration judge could then release an alien on his own recognizance, thereby conditionally paroling an alien. And that, I posit, violates 212.5. Another reason which the court touched upon why conditional parole shouldn't be equated with parole into the United States is the existence of 245i. And I don't think I need to go any further into that. Or Tega relied on that, too, at the end of the opinion. That's correct. I guess I have nothing else to say unless the court has any additional questions. Let me ask how Zhang does not help the appellant as far as you're concerned. It didn't at all deal with the tension between 236a1 and 212d5a. It didn't address the differences between conditional parole and parole into the United States. It dealt with the validity of regulation, and that regulation is gone. There was a conflict between a regulation and a statute. The statute said an alien status can be adjusted if he is inspected and admitted or paroled into the United States. 241.c8 eliminated an arriving alien's eligibility to adjust in removal proceedings. That made it impossible for an arriving alien who's paroled to adjust his status. So we struck down the regulation. That's correct. Is there anything further? I think not. Thank you. Thank you. Counsel, hear from you in rebuttal. If I may, just a point on Zhang. The finding that there was a parole based on a non-statutory factor was a prerequisite to any of the other findings in Zhang, and that's why I would argue it applies. The one to address the issues of surreptitious entry and also the persuasiveness of these memorandum First of all, if you look at the way, and maybe the way to do this is to paint two different pictures. One is of someone coming from the Caribbean, Haiti or Cuba, in a boat who is interdicted at sea. That person, under various ways that the immigration authorities have done it or at times they are taken into custody and then released upon a review under 236, sometimes with a release on recognizance. And this might be one of the concerns that you expressed in terms of would anyone granted 236 release on recognizance be eligible? That may be the case, but it's not that large a group of people. In fact, my experience has been the immigration authorities use 236 release on recognizance about as sparingly as they use standard 212D parole. They truly do, in practice, treat them as very similar mechanisms. They don't just give somebody a release on recognizance. It may have been that way before 1996, but it certainly isn't that way now. And then the second thing to look at is the same person, like Ms. Rada, a Central American or a Mexican, coming across a land border and sneaking across the country, just like the person in the boat is trying to sneak across the seas to get to the beach. It's the same type of entry that the person is really contemplating. And in that regard, looking at the 236 ROR, or release on recognizance, that's granted to the person at the land entry as equivalent to the 212 parole that's given at the seaport, or interdiction on the seas, is really the same kind of thing. And that's another reason to look at why, under the Cuban Adjustment Act, the agency, which apparently has not been rescinded, if the government is to be believed, only the 1998 memo was rescinded, not the 1999 memo. And that is why that interpretation, which is of the identical language, not the similar language, which is what the Ninth Circuit said, identical language between the Cuban Adjustment Act and 245A, should be given effect to a 236 parole. If we disagree with you, the petitioner's only option would be to go back to Nicaragua and come in through a consular permission. And my experience with the waiver processes that are provided under the Act are that they are typically taking two years at a minimum. There is a pilot program exclusively for Mexicans that sometimes can function to work in two weeks if it's a very, very simple case, which Ms. Radoff's might be, but she's not eligible for that pilot program and every other consulate in the world. So really a minimum of a two-year wait for all of the processing to go on, which for her children, two years is a long time, whether they're with her down in Nicaragua or whether they're with their father here. Whatever they face, that's a serious thing. But in the end, and in respect to the power to persuade, the government said nothing about its analysis that was provided in the September 2007 memo. I would assert that if that memo affirms or focuses on Ortega Cervantes' case from the Ninth Circuit, it has the same failings. If the original memos are looked at, 98 and the 99 memos are looked at, the agency was looking at exactly the same kind of language and exactly the same kind of procedures and saying we think 212 and 236 when we ROR someone, they're the same and we're doing the same kind of considerations. Well, let's ask for a pally to file that memo with a not greater than eight-page supplemental brief of why it relates to this matter and then a ten-page ability to respond. I mean eight-page ability to respond within ten days thereafter by appellant so we have it all before us. Is that clear? All right. So within ten days, file the internal memo of September 2007 together with a not greater than eight-page supplemental brief, which can be a letter brief, and then ten days thereafter, similarly. All right? All right. Thank you, counsel. Well argued. We'll take it under advisement. I'm going to ask the clerk to recess for a moment.